UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HEIDRICK & STRUGGLES INTERNATIONAL, INC., | |
| Plaintiff, | |
| v. | CIVIL ACTION No. 1:18-cv-01503 (PAE) |
| KORN/FERRY INTERNATIONAL, CHAD ASTMANN, DEEPALI VYAS, and DANIEL KAPLAN, | |
| Defendants. | |

## AMENDED COMPLAINT

Plaintiff Heidrick & Struggles International Inc. ("H&S"), for its Amended Complaint against Defendants Korn/Ferry International ("Korn Ferry"), Chad Astmann ("Astmann"), Deepali Vyas ("Vyas") and Daniel Kaplan ("Kaplan and, together with Astmann and Vyas, the "Former H&S Employees"), by and through its undersigned counsel, Reed Smith, LLP, hereby alleges as follows:

## SUMMARY OF THE ACTION

1.      H&S is a publicly traded company listed on NASDAQ and is one of the world's leading executive search and leadership consulting firms specializing in chief executive, board of directors, and senior level management assignments.  H&S' executive search experts have assisted many of the most successful organizations to build their senior leadership teams and, as a result, H&S is a recognized leader among global executive search firms.

2.      This action stems from the Former H&S Employees' breaches of clear, unambiguous and narrowly tailored non-compete, non-disclosure, non-solicitation and other provisions of their respective employment agreements with H&S as well as, among others, claims for misappropriation of confidential and proprietary information and trade secrets in

violation of federal statutory and common law.

3.     Korn Ferry, a direct competitor and rival of H&S, has tortiously interfered with the Former H&S Employees' agreements with H&S and aided and abetted their breaches of their duties of loyalty to H&S by poaching the Former H&S Employees with the specific purpose of misappropriating H&S' confidential and proprietary information and trade secrets and using that information to gain a competitive advantage over H&S at H&S' expense.

4.     As set forth further below, H&S' confidential and proprietary information and trade secrets include, but are not limited to, its proprietary and innovative candidate assessment model, through which H&S employs a differentiated approach to executive searches, as well as information pertaining to H&S clients, including their business plans, leadership teams, succession plans, talent needs, personnel practices, and cultures.

5.     H&S' confidential and proprietary information and trade secrets also includes, but is not limited to, information about H&S engagements and assessments, earnings, finances, budgets, operations, methods, and strategy, pricing structure, software, operating systems, applications, and program listings and confidential and proprietary databases as well as private information related to the employment, performance and compensation of candidates and fellow employees.

6.     H&S' confidential information and trade secrets were developed over a long period of time, with great effort and at great expense, to maintain and grow H&S' business and to maintain and sustain a competitive advantage over other search firms that do not have access to or use of such information.

7.     This information is not obtainable from public sources and, as a result, H&S goes to great lengths to protect, preserve and keep it safeguarded including, but not limited to,

restricting access to it.

8. In consideration of their compensation, H&S employees are required to sign non-disclosure agreements, forbidding employees from transferring the confidential information and trade secrets to outside, non-secure computer or email systems or to third parties, such as Korn Ferry.

9. As set forth below, the Former H&S Employees each had access to and currently possess H&S confidential information and trade secrets.

10. Beginning in October 2017, each of the Former H&S Employees resigned from H&S and accepted employment at Korn Ferry in direct contravention of the express terms of their respective employment agreements.

11. With Korn Ferry's knowledge and assistance, the Former H&S Employees have violated, and continue to violate, the post-employment restrictions set forth in their employment agreements with H&S, as well as common law and statutory duties owed to H&S by, among other things, soliciting H&S employees, contacting H&S clients, forwarding confidential client and pitch materials from H&S computers to their personal email addresses, and working for Korn Ferry while in possession of H&S confidential and proprietary information and trade secrets.

12. Despite being advised by H&S of their obligations under their agreements, including to return and not use H&S confidential information and trade secrets, Astmann, Vyas and Kaplan—induced, aided, and abetted by Korn Ferry—have failed to comply with those obligations.

13. H&S brings this action to enforce its contractual, common law and statutory rights and seeks damages for, among others, (i) Astmann's, Vyas' and Kaplan's breaches of the

non-competition and non-solicitation provisions of their respective employment agreements; (ii) Korn Ferry's tortious interference with the Former H&S Employees' agreements with H&S; (iii) Korn and Ferry's aiding and abetting of the Former H&S Employee's breaches of their duty of loyalty to H&S; and (iii) Defendants' misappropriation of H&S' confidential and proprietary information and trade secrets.

14.     H&S seeks, among other relief, a judgment in an amount to be determined at trial, and injunctive relief.

## THE PARTIES

15.     Plaintiff H&S is a corporation organized under the laws of the State of Delaware with its principal place of business at 233 South Wacker Drive, Suite 4900, Chicago, Illinois, 60606.

16.     Defendant Astmann is a former employee of H&S in New York City who now works for Korn Ferry in New York City and resides at 86 Edgemont Avenue, Larchmont, New York 10538.

17.     Defendant Vyas is a former employee of H&S in New York City who now works for Korn Ferry in New York City and resides at 196 Boulder Ridge Road, Scarsdale, New York 10583.

18.     Defendant Kaplan is a former employee of H&S in New York City who now works for Korn Ferry in New York City and resides at 25 Canterbury Road, Livingston, New Jersey 07039.

19.     Korn Ferry is a publicly-traded corporation organized under the laws of the State of Delaware, with a principal place of business in Los Angeles, California and with offices at 200 Park Avenue, 33rd floor, New York, NY 10166.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it presents claims that arise under federal law.

21.     Venue is appropriate in this District pursuant to 28 U.S.C. 1391(b)(1) and (2) because all Defendants are residents of this District and because a substantial part of the events and omissions giving rise to the claims occurred in this district.

## FACTUAL BACKGROUND

### A.     Description of H&S' Business

22.     H&S is a worldwide executive search firm and leadership advisory firm, specializing in chief executive, board of directors, and senior level management assignments, as well as leadership consulting assignments, such as executive assessment, succession planning and corporate governance.

23.     H&S' consultants work in a structure similar to that of a law firm.  The Partners are primarily responsible for obtaining new search engagements.  Once a client signs an engagement agreement with H&S to perform an exclusive search, an Associate generally takes primary responsibility for contacting candidates, assessing the candidates and doing background research.  Partners typically perform the candidate interviews and finalize the report to the client with the candidate recommendation.

24.     The services provided by H&S to its clients are professional in nature, and involve near-permanent client relationships.  The individual engagements at issue often involve fees in excess of $100,000, and involve such matters as assisting in identifying, hiring and retaining Chief Executive Officers, members of the Board of Directors, or other top positions; or consulting on matters pertaining to the highest levels of leadership in the client's organization. As such, clients typically retain organizations for such services not based on who is the lowest

bidder, but rather, those organizations with the personnel and resources to provide first class services in these areas.

25.     The marketplace for retained executive search firms is highly competitive, with only a small number of global search firms, including H&S and Korn Ferry, directly competing for exclusive engagements to identify and assess senior level positions worldwide.

26.     H&S invests substantial resources, including monetary resources, in developing and retaining relationships with such clients, including by developing innovative proprietary databases and models that clients find valuable because they are capable of measuring a job candidate's growth potential.  These clients frequently work with the same provider for many years, developing confidence as successful work is performed for them.

27.     H&S prides itself on its expertise in identifying the available pool of talent fitting its clients' particular needs and developing trust and relationships with the best executives for particular roles.

28.     H&S is highly skilled at assessing talent, taking into consideration client needs, the responsibilities of the role being filled, and a candidate's experience and career path trajectory.  H&S also is skilled at assessing whether a candidate is a good fit with a client's executive leadership teams.

29.     Given the competitive nature of the marketplace, to protect its relationships with clients, H&S' U.S. Company Handbook makes clear that H&S employees have a duty of loyalty to H&S which prohibits such employees from referring potential engagements to other consultants or companies or saving potential engagements for future employment if they decide to leave H&S.

**B.     H&S Trade Secrets and Confidential Information**

30.     H&S' trade secrets and confidential and proprietary information are the

touchstone of H&S' business model. This information is a critical component of H&S' ability to obtain, retain and develop client relationships and compete in the marketplace.

31.     H&S' confidential information and trade secrets have been developed over a long period of time to sustain a competitive advantage over other search firms that do not have access to such information and cannot be easily duplicated.

32.     H&S trade secrets and confidential and proprietary information are not generally known to the public and concern H&S clients and H&S' business.

33.     H&S' US Company Handbook specifically provides that H&S' confidential information includes non-public information regarding: (i) H&S' performance, products and services, hiring plans, employee mapping, recruiting, hiring and/or restructuring analyses, plans and initiatives, marketing and/or business development plans; (ii) current and prospective clients, their hiring plans, marketing and/or business development plans and other respective strategies, as well as any assessments or analyses of such clients and potential clients; (iii) the work history and/or qualifications of candidates and potential candidates for placement, sources, and any assessments or analyses of such individuals learned in the furtherance of an employee's duties and responsibilities to the Company; and (iv) H&S employees, such as their performance and compensation and leaves.

34.     With respect to H&S clients, H&S compiles various categories of confidential and proprietary information during the course of each particular search for which H&S is engaged and throughout the tenure of the client relationship more generally. Such information includes client business plans, leadership teams, succession plans, talent needs, personnel practices, cultures, earnings and finances, operations, methods, and strategy, and the performance and compensation of candidates and client employees.

35.     For example, when H&S wins a project, H&S spends significant time with the client at the outset or "kickoff" of the engagement.  H&S and the client discuss, among other things, why the search is happening and changes in the client's business that necessitated the search, which clients typically classify as confidential.

36.     Clients share with H&S confidential information concerning, among other things, their internal assessment of the role to be filled and their assessment of their marketplace image.

37.     Clients trust H&S with this information, including trusting H&S not to share it as H&S begins to search for appropriate candidates to fill a client's needs.  Client communications may even indicate that they are not to be forwarded and that the information reflected therein is to be used by H&S team members only.

38.     H&S confidential and proprietary information is not limited to information concerning its clients.  Information concerning H&S' business similarly is confidential and proprietary and constitutes trade secrets.  Such information includes, but is not limited to, H&S' pricing structure, financial projections, strategies, targets and budgets, software, operating systems and databases, as well as private information related to the employment, performance and compensation of H&S employees.

39.     H&S employs three proprietary databases – the *Infinity* framework, *Latitude* and *Leadership Signature* – all of which were developed internally at H&S at substantial expense based upon H&S' expertise and years of experience in the industry.  These proprietary tools reflect H&S' industry knowledge and insights and differentiate H&S from competitors in the marketplace.

40.     The *Infinity* framework is a proprietary candidate assessment tool, composed of four unique quadrants developed over a number of years by H&S to measure whether and the

extent to which a proposed candidate is an appropriate "fit" for a particular role.

41.     The four *Infinity* quadrants are: (i) technical experience; (ii) cultural fit and impact; (iii) leadership; and (iv) META, which is an acronym for mobilization, executive, transformation and agility.

42.     The META quadrant is a particular differentiator or "difference maker" for H&S because it is capable of assessing the future growth potential of candidates beyond their current capabilities.  H&S clients find this tool to be extremely valuable because it measures whether candidates have agility, foresight and the ability to be transformational in their potential new position.

43.     When the *Infinity* framework was rolled out to the firm, H&S consultants were trained on how to interview candidates with the specific purposes of assessing these competencies.

44.     The training program included eight different modules as well as the administration of a test.

45.     The *Infinity* framework is linked to H&S proprietary internal tracking database, referred to as *Latitude*, which houses, client and contact information, engagement information, and data about potential business opportunities which H&S gathers from candidates.

46.     On information and belief, while H&S' competitors tout their own systems and models that they claim achieve the same goal as the *Infinity* framework, none of those systems captures the same information or analyzes it in the same way as H&S does.  To the extent any competitors seek to improve their own systems and models or to compete against H&S, having employees who are familiar with the *Infinity* framework would provide a substantial competitive benefit.

47.     H&S provides not only traditional executive search services, but also leadership consulting services, which includes leadership development, onboarding and executive coaching services, and organizational culture shaping.  H&S' ability to sell and provide these services hinges on the proprietary nature of its *Leadership Signature* tool, which also is unique to H&S.

48.     Using *Leadership Signature*, H&S works with clients to ensure team alignment and engagement to create the conditions for long term client success.

49.     H&S' pricing for these services as well as H&S' expertise in selling and pitching these services is confidential and proprietary to H&S and provides the foundation for H&S' success in the marketplace.

50.     The value of these tools lies in their confidentiality and H&S' competitive advantage would be threatened if the information was known in the marketplace.

51.     H&S consultants also participate in global yearly and quarterly practice group meetings, in which non-public information about H&S' top accounts is shared, including the amount of revenue derived from such accounts and the services sold to such accounts.  During such meetings, consultants also review non-public information concerning client initiatives, business initiatives, target accounts, strategic accounts, performance of H&S' practice groups, and marketing.

52.     H&S takes significant steps to protect its trade secrets and confidential information, including requiring consultants to execute confidentiality agreements.

53.     The US Company Handbook provides that H&S documents, files, records, computer files or similar materials may not be removed from H&S premises or H&S' owned or licensed networks

54.     Consultants with access to such information must have a username and password

to log into H&S' internal database and must acknowledge their confidentiality obligations every time they access the H&S database, including from the company network.

55.     Each time consultants access *Latitude*, they are shown a "click through" screen, which reminds them of H&S' expectation that the information contained in the database will remain secure and confidential.  The screen provides, in part:

> [b]y continuing to the next page and accessing and using Latitude, I hereby acknowledge that in connection with my duties and responsibilities at Heidrick & Struggles (the "Company"), I will be given access to and will become familiar with highly sensitive, protected confidential and proprietary information of the Company, its current and potential clients and its business prospects (collectively, "Confidential Information"). . . . By accessing and using Latitude, I hereby acknowledge and agree that I will not, without the Company's consent, disclose any Confidential Information to any third party and shall not use the Confidential Information except pursuant to and in connection with my duties and responsibilities to the Company and in compliance with the Company's Code of Conduct and any other Company policies and procedures.

56.     In addition, when consultants are outside of H&S' computer network, they must separately enter a username and password to log into *Latitude*.

**C.     Korn Ferry's Predatory Competitive Conduct**

57.     H&S' principal competitors include organizations that deliver executive search and advisory services on a scale that crosses multiple functions, industries and geographies.

58.     Unlike boutique firms that focus on a particular industry or geographic market, these organizations serve a broader range of national and international clients, maintain a presence in markets around the globe and credibly represent themselves as having a comprehensive set of services focused on talent acquisition.

59.     Korn Ferry is one of H&S' direct competitors across the globe, with H&S maintaining 15 offices across the United States, plus 38 additional offices worldwide, while Korn Ferry maintains 19 offices in the United States, with an additional 101 offices worldwide.

60.     Beginning in or around October 2017, Korn Ferry engaged in a predatory

competitive scheme that included, among other things, identifying certain key H&S employees, poaching these key employees from their positions at H&S, recruiting them to work at Korn Ferry with enticements of, among other things, above-market compensation and, then, intentionally misappropriating, misusing, and/or benefitting from the misuse of H&S' confidential and proprietary information and trade secrets.

61. To execute the predatory scheme, Korn Ferry sought to gather detailed information concerning the business revenue generated by H&S' employees and then to use that information to Korn Ferry's benefit.

62. For example, on January 1, 2018 – immediately upon the close on calendar year 2017 – Defendant, Daniel Kaplan, sent Marat Fookson, Korn Ferry's Vice President of Global Compensation and Benefits, his "numbers through the end of November," presumably hoping that it would suffice to enable Korn Ferry to prepare an offer of employment for him.

63. Korn Ferry's plan also included contacting by telephone numerous H&S consultants in the United States across industry practices to undermine the stability of H&S' divisions and misuse information gleaned from former H&S employees to boast Korn Ferry's profits.

64. Among other practices, Korn Ferry targeted its recruitment efforts to H&S' Global Technology & Services Practice, which has placed some of the most recognizable executives to lead powerful global technology organizations.

65. During one week in February 2018, an H&S employee received three calls from Korn Ferry seeking to entice her to leave her position at H&S and join Korn Ferry.

66. Werner Penk, a Korn Ferry consultant, similarly placed at least one call in February 2018 seeking to recruit an H&S employee to join Korn Ferry. H&S' employee

declined the offer.

67.     Another H&S employee reported that he received a call from Korn Ferry in February 2018 and was asked what amount of money was necessary to entice him to leave H&S and join Korn Ferry.  The message received from Korn Ferry was that Korn Ferry would pay whatever amount was necessary to ensure his departure from H&S.

68.      Similarly, H&S learned that Sally Beatty, a former H&S employee that joined Korn Ferry as a Senior Client Partner in its Tech/Private Equity Practice, received a compensation package that greatly exceeds her H&S compensation package.

69.     In total, Korn Ferry has poached numerous H&S employees from offices in the United States, including, but not limited to, Defendants Astmann, Vyas, and Kaplan as further set forth below.

70.     U.S. employees who have left H&S to join Korn Ferry include Sally Beatty, Brad Berke, Lorraine Hack, Abrue Hussain, Matt Stencil, Carolyn Vavrek, Paul Viola, and Jason Waterman.

71.     In addition, H&S has poached at least six employees from H&S' international locations, including Paris, Singapore, and Australia.[1]

72.     Korn Ferry's recruitment of H&S employees proceeded notwithstanding and in spite of the fact that Korn Ferry is aware that it is common industry practice for executive recruiters to be bound by restrictive covenants in their employment agreements, including the non-competition, non-solicitation and confidentiality agreements at issue here.

73.     Indeed, Lorraine Hack, a former H&S employee who joined Korn Ferry, recently confirmed that her employment agreement with Korn Ferry, executed in early 2018, includes a

---

[1] H&S international employees poached by Korn Ferry include, but are not limited to, Marc Bartel (Paris), Scott Hensarling (Singapore), Daren Kemp (Singapore), Gareth McIlroy (Singapore), Graham Poston (Singapore) and Aaron Justin Duncan Smyth (Australia).

six-month non-competition agreement, a non-solicitation provision applying to clients and employees and a confidentiality provision.

**D.** **Chad Astmann**

1. **The Astmann Agreement**

74.     Pursuant to an employment agreement between Astmann and H&S, dated March 18, 2014, effective January 1, 2014, Astmann served as Partner, Sector Leader for Asset Management in the Financial Services practice of H&S (the "Astmann Agreement").

75.     Pursuant to the Astmann Agreement, Astmann was generously compensated, with an initial annual base salary that exceeded $200,000 per year, plus a retention bonus and discretionary bonus that had the potential to exceed his base salary.

76.     Astmann agreed that, in exchange for the compensation and benefits set forth in his employment agreement, he would not solicit current or prospective clients of H&S for a period of six months following his voluntary resignation from H&S.  Specifically, the Astmann Agreement provides that:

> for a period of six (6) months after the date of [his] employment with [H&S] ends, [Astmann] shall not . . . solicit, divert or attempt to obtain business from, accept business from, or do business with or aid or assist anyone else in the solicitation or acceptance of business from any current or prospective client of [H&S] for whom [he] provided services or solicited for engagement or assignments on behalf of [H&S] during the last twelve (12) months of [his] employment.

77.     In Astmann's role at H&S, Astmann was privy to and received confidential information concerning H&S' target accounts, strategic accounts, performance statistics, marketing plans, market differentiation techniques, revenue attributed to each client, as well as information concerning business pitched and new engagements that had been secured.

78.     Exhibit A to the Astmann Agreement is a Confidentiality Agreement, pursuant to which Astmann additionally agreed to protect H&S' Confidential Information "as a condition for

initial and continuing employment" with H&S.  Confidential Information is defined to include:

> [I]nformation which is not generally known to the public which is used in [H&S] business including, but not limited to, products or services; fees, costs and pricing structure; designs; analyses; drawings; photographs; reports; computer software, including operating systems, applications, and program listings, flow charts, manuals and documentation; confidential and proprietary databases or databases containing confidential and proprietary information; financial and accounting statements, projections, targets, budgets, and other related information; private information related to the employment, performance and compensation of fellow employees; business plans, strategies and methods; inventions and new developments and methods whether or not reduced to practice; H&S client lists; H&S clients and candidates and their information; supplier and vendor information; all copyrightable works; and all similar and related information in whatever form.

79.     The Confidentiality Agreement prohibits Astmann from:

> disclos[ing] or us[ing] for the benefit of any person, corporation or other entity . . . any and all files, trade secrets or other confidential information concerning the internal affairs of [H&S] and its affiliates, including but not limited to information pertaining to its clients, services, products, earnings . . .

80.     Astmann likewise agreed that, upon termination of his employment from H&S, he would:  (i) "return and deliver to H&S all of the papers records, film, documents . . .  which [he] may have relating, in any way, to the business or clients of H&S, all of which is and shall be the exclusive property of H&S;" and (ii) "immediately delete, destroy, and/or disable any email, 'cloud' or other remote storage accounts which contain any electronic copies of and/or data reflecting any [H&S] Confidential Information . . ."

81.     Additionally, in accordance with paragraph 11(c) of the Astmann Agreement, for good and valuable consideration, Astmann agreed not to solicit any employee of H&S into a position where H&S Confidential Information is relevant.  In particular, the Astmann Agreement provides that:

> for six (6) months after the date of [Astmann's] employment with [H&S] ends for any reason, [Astmann] [] agree[s] not to directly or indirectly solicit or hire any employee of [H&S] [he] worked with during [his] employment at [H&S] or any individual who possesses Confidential Information about [H&S] into any

position, engagement or assignment where such Confidential Information may be relevant.

2.  **Astmann's Resignation and Breaches of the Astmann Agreement**

82.     Astmann resigned from H&S on October 10, 2017 to join Korn Ferry as Co-Head of the Global Asset Management practice in Korn Ferry's office in New York City.

83.     Astmann previously worked with Defendant Vyas at H&S in the same New York City office.  Vyas worked in H&S' financial services practice.

84.     As set forth below, Vyas left H&S effective January 18, 2018 and joined Korn Ferry's financial services practice as a senior client partner as of January 29, 2018, less than four (4) months after Astmann left H&S.

85.     Astmann, as an employee and agent of Korn Ferry, recruited Vyas to join Korn Ferry, less than six months after he left H&S in violation of the Astmann Agreement and notwithstanding that Korn Ferry had knowledge that H&S employees, such as Astmann, were prohibited from such solicitations.

86.     Indeed, Astmann even boasted that he was involved in recruiting Vyas to Korn Ferry despite that he specifically knew he was prohibited from doing so.

87.     In addition, upon information and belief, Astmann recently was engaged to perform an executive search for one of H&S' important clients in violation of the Astmann Agreement.

88.     Astmann's involvement with any such H&S clients necessarily will involve the use of and disclosure of proprietary H&S confidential and proprietary information and trade secrets, including information concerning the client's needs and candidate preferences, for Astmann's benefit and for the benefit of Korn Ferry, and to the detriment of H&S.

E.     **Deepali Vyas**

1. **The Vyas Agreement**

89. Pursuant to an employment agreement between Vyas and H&S, dated July 25, 2014, with an effective date of September 2, 2014, Vyas served as a Principal in Financial Services at H&S (the "Vyas Agreement").

90. In this role, Vyas' responsibilities included, among other things, identifying, hiring and retaining high-level executives to place at H&S' clients, ranging from start-ups to large corporations. She performed these and similar functions throughout her tenure at H&S until her voluntary resignation on January 16, 2018.

91. Pursuant to the Vyas Agreement, Vyas was generously compensated, with an initial annual base salary that exceeded $150,000, plus a sign-on bonus and discretionary bonus that had the potential to exceed her base salary.

92. During her tenure at H&S, and by virtue of her role as an H&S Principal, Vyas was introduced to important H&S clients, many of which Vyas had not previously known. She also was integrated into many of H&S' long-term client relationships.

93. To service those clients, Vyas was privy to and received confidential information concerning H&S' target accounts, strategic accounts, performance statistics, marketing plans, market differentiation techniques, revenue attributed to each client, as well as information concerning business pitched and new engagements that had been secured.

94. Vyas expressly agreed that her employment with H&S "necessarily involve[d] [her] access to and understanding of information pertaining to the business of [] [H&S] . . .its clients and their respective employees, plans and strategies, which contains trade secrets, proprietary data or other confidential material of H&S and/or its clients." Vyas explicitly agreed to maintain and preserve the confidentiality of H&S' trade secrets and other confidential information.

95.     Specifically, Exhibit A to the Vyas Agreement is a Confidentiality Agreement, pursuant to which Vyas agreed to protect H&S' Confidential Information "as a condition for initial and continuing employment" with H&S.  Vyas agreed that she would not:

> disclose or use for the benefit of any person, corporation or other entity, or for [her]self any and all files, trade secrets or other confidential information concerning the internal affairs of [H&S] and its affiliates, including, but not limited to, information pertaining to its clients, services, products, earnings, finances, operations, methods or other activities . . .

96.     The Confidentiality Agreement also reflects Vyas' agreement not to accept any employment which would cause the disclosure of H&S Confidential information for a period of six months following her departure from H&S:

> as part of [Vyas'] duties and responsibilities to protect and not disclose the proprietary and Confidential Information of [H&S], for six months following the termination of [her] employment with [H&S], [Vyas] shall not accept any employment, assignment, matter, client representation or engagement as an employee of or consultant to any company or entity (including self-employment) which would potentially benefit from and/or cause the likely disclosure of [H&S'] proprietary information, Confidential Information or trade secrets.

97.     Paragraph 13 of the Vyas Agreement reflects Vyas' additional agreement not to solicit current or prospective clients of H&S:

> for a period of twelve (12) months after the date [Vyas'] employment with [H&S] ends for any reason, [Vyas] shall not . . . solicit, divert or attempt to obtain business from, accept business from, or do business with – or aid or assist others in the same – with any Person for whom [she] provided services or solicited for the provision of services on behalf of [H&S] during the last twelve (12) months of [her] employment for the purpose of engaging in the same Business as [H&S].

98.     In accordance with paragraph 14 of the Vyas Agreement, Vyas agreed not to solicit any employee of H&S into a position where H&S Confidential Information is relevant.  In particular, the Vyas Agreement provides that:

> for twelve (12) months after the date of [Vyas'] employment with [H&S] ends for any reason, [Vyas] agree[s] not to directly or indirectly solicit or hire any employee of [H&S] with whom [she] worked during [her] employment at [H&S], or any individual who possesses Confidential Information about [H&S] into any

- 18 -

position, engagement or assignment where such Confidential Information may be relevant.

99.     Vyas additionally agreed that, upon termination of her employment from H&S, she would:  (i) "return and deliver to H&S all of the papers records, film, documents . . .  which [she] may have relating, in any way, to the business or clients of H&S, all of which is and shall be the exclusive property of H&S;" and (ii) "immediately delete, destroy, and/or disable any email, 'cloud' or other remote storage accounts which contain any electronic copies of and/or data reflecting any [H&S] Confidential Information . . . "

2.     **Vyas' Resignation and Breaches of the Vyas Agreement**

100.     Vyas, who worked for H&S in New York, submitted her resignation to H&S on January 16, 2018 and accepted employment at Korn Ferry.

101.     In a January 17, 2018 email to her manager at H&S, David Boehmer, Vyas stated that she would "absolutely be a good leaver to the firm."

102.     Notwithstanding this representation, Vyas has breached her employment agreement with H&S in several respects.

a.     Breaches of the Non-Competition and Non-Solicitations Provisions of the Vyas Agreement

103.     Within two weeks of her resignation, Vyas breached the non-competition provisions of her employment agreement by accepting a position with Korn Ferry in substantially the same role she had at H&S.

104.     At the time of her resignation, Vyas initially misled H&S.  She informed H&S that she would be employed in Korn Ferry's Hay Group, which is a separate managing consulting division of Korn Ferry and substantially different from her prior role at H&S.

105.     By the end of January 2018, H&S had suspicions that Vyas was not working for the Hay Group, but instead was working as an executive recruiter in substantially the same

capacity as she worked for H&S.

106.　　On January 29, 2018, Korn Ferry issued a Press Release announcing that, rather than join the Hay Group, as Vyas had represented to H&S, Vyas joined Korn Ferry's New York office as a senior client partner in their financial services practice.　The press release touted Vyas' experience, including her prior experience at H&S, and even highlighted the similarity between her work at H&S and her new position at Korn Ferry, stating that she "joins Korn Ferry from a large executive search firm where she was sector leader of the Americas Global Markets & Hedge Fund Practice."

107.　　That Vyas is now working at Korn Ferry in the same capacity as she had at H&S, as an executive recruiter, in express violation of the Vyas Agreement, was only confirmed to H&S on February 26, 2018, when another H&S analyst, Abrue Hussain, who had worked with Vyas in H&S' Financial Services Practice, submitted her resignation notice to H&S.

108.　　Ms. Hussain informed H&S that she intends to work at Korn Ferry in support of Vyas and that she will be working with Vyas on executive searches for Korn Ferry's benefit.

109.　　Given the information provided by Ms. Hussain, H&S believes that Vyas has contacted or will soon contact clients that had retained H&S for exclusive executive search engagements to induce them to move their business to Korn Ferry.

110.　　Vyas' continued involvement with any such clients necessarily will involve the use of and disclosure of proprietary H&S confidential and proprietary information and trade secrets, including information concerning the client's needs and candidate preferences, for Vyas' benefit and for the benefit of Korn Ferry, and to the detriment of H&S.

　　　　　b.　Breaches of the Confidentiality and Non-Disclosure Provisions of the Vyas Agreement

111.　　Vyas' employment with Korn Ferry necessarily will involve her use of H&S

Confidential Information, which Vyas learned throughout her tenure at H&S.

112.    In performing executive search projects at Korn Ferry, in the same business sector that she had been working prior to her resignation from H&S, Vyas will inevitably use and disclose H&S confidential information in violation of her employment agreement.

113.    On or around February 22, 2018, H&S discovered that prior to her resignation, on January 11, 2018, Vyas accessed a "backup" zip file in the "download" folder on the Thinkpad X1 laptop computer issued to her by H&S.  Vyas subsequently deleted the entire "download" folder, so H&S is unable to determine what information was in the zip file.

114.    In addition, a search by H&S of Vyas' emails on January 17, 2018 revealed that, in violation of her employment agreement and H&S' information technology practices, Vyas misappropriated H&S Confidential Information by forwarding confidential H&S documents relating to at least two current H&S clients to her personal email accounts during the prior month.

115.    For example, in one such email, dated January 12, 2018, a mere four days prior to her resignation, Vyas forwarded confidential information that she had received from a client to her personal email address notwithstanding the client's instruction that the information reflected in the communication was to remain confidential and be used only by H&S personnel.  Upon information and belief, Vyas intends to use this material in connection with her role at Korn Ferry.

116.    Similarly, approximately one week prior to her resignation, on January 8, 2018, Vyas forwarded to her personal email address a communication she had received from a candidate actively being considered for placement at an H&S client.  On information and belief, Vyas has attempted to and will attempt to continue to solicit business from this client in direct

breach of her obligations under the Vyas Agreement.

117. By accepting a position with Korn Ferry, and soliciting employees and, potentially, customers that she was introduced to and became acquainted with by virtue of her position at H&S, Vyas is causing H&S to be at a permanent competitive disadvantage. In particular, in connection with her role at Korn Ferry, Vyas is necessarily misusing to her benefit and to Korn Ferry's benefit, confidential information and trade secrets gleaned as a result of her position at H&S and based upon H&S' historical relationships with clients and candidates as well as H&S' extensive experience in the executive recruitment marketplace.

c. <u>H&S Efforts to Persuade Vyas to Cure Her Breaches of the Vyas Agreement</u>

118. On January 18, 2018, H&S sent Vyas a letter reminding her of her ongoing post-termination obligations, including the non-solicitation, non-competition, and confidentiality obligations to H&S (the "<u>January 18 Vyas Letter</u>"),

119. Having received no response, on January 31, 2018, H&S sent a second letter to Vyas (the "<u>January 31 Vyas Letter</u>"), informing Vyas that, *inter alia*, H&S had learned that Vyas had forwarded certain H&S Confidential Information directly related to H&S clients and open engagements to her personal email account, and that such actions were in violation of her employment agreement and H&S policy. In the January 31 Vyas Letter, H&S also requested that Vyas: (i) provide a written explanation for her decision to forward H&S pitch-related documents to her personal email account; (ii) return all H&S Confidential Information and property of H&S to H&S and delete all such information from any device containing such information; and (iii) provide written confirmation of the same by February 2, 2018. H&S also requested that Vyas confirm her start date with Korn Ferry by February 2, 2018.

120. Vyas did not directly respond to the January 18 Vyas Letter or the January 31

Vyas Letter. However, on February 15, 2018, an attorney named David T. Harmon of Norris, McLaughlin & Marcus, P.A. sent a letter to H&S (the "February 15 Vyas Letter"), purporting to explain certain of Vyas' actions discussed above. The February 15 Vyas Letter stated that there had been no violation of the Vyas Agreement, that Vyas intended to be a "good leaver," and that Vyas would "conduct herself in accordance with the [Vyas Agreement] and the applicable law." However, those representations in the February 15 Vyas Letter are belied by the conduct described above.

F. **Daniel Kaplan**

1. **The Kaplan Agreement**

121.    Pursuant to an employment agreement between Kaplan and H&S, dated February 20, 2015, accepted by Kaplan as of February 24, 2015 and effective March 1, 2015, Kaplan served as a Partner and Co-Head of the Chief Human Resource Officer ("CHRO") Practice at H&S  (the "Kaplan Agreement").

122.    In this role, Kaplan's responsibilities included, among other things, identifying, hiring and retaining high-level executives to place at H&S' clients, ranging from start-ups to large corporations. Kaplan performed these and similar functions throughout his tenure at H&S until his voluntary resignation on January 23, 2018.

123.    Pursuant to the Kaplan Agreement, Kaplan was generously compensated, with an initial annual base salary that exceeded $300,000, plus a sign-on bonus and discretionary bonus that had the potential to exceed his base salary.

124.    The Kaplan Agreement provides that Kaplan is required to reimburse H&S a pro-rata portion of the sign-on bonus if he "resign[s] from Heidrick for any reason . . . within three years" of the payment date.

125.    During his tenure at H&S, and by virtue of his role as an H&S Partner, Kaplan

was introduced to important H&S clients, many of which Kaplan had not previously known. He also was integrated into many of H&S' long-term client relationships.

126. To service those clients, Kaplan was privy to and received confidential information concerning H&S' target accounts, strategic accounts, performance statistics, marketing plans, market differentiation techniques, revenue attributed to each client, as well as information concerning business pitched and new engagements that had been secured.

127. Exhibit A to the Kaplan Agreement is a Consultant Business Protection Agreement, which specifies that Kaplan will be given access to H&S confidential information "because of [his] employment by" H&S. Such access is granted "in exchange for the consideration" provided for in the Kaplan Agreement and is "expressly conditioned upon [Kaplan's] agreement to protect the information and assets from unauthorized use, disclosure or transfer."

128. Kaplan additionally agreed to protect H&S confidential information and to prohibitions on:

> directly or indirectly, in whole or in part, disclos[ing], or transfer[ing] any files, documents, or other forms of trade secrets or Confidential Information concerning the affairs of H&S.

129. Kaplan further agreed that he would not accept any employment which would cause the disclosure of H&S confidential information for a period of six months following his departure from H&S:

> as part of [Kaplan's] duties and responsibilities to protect and not disclose the proprietary and Confidential Information of Heidrick, for six months following the termination of your employment with Heidrick, [he] shall not accept any employment, assignment, matter, client representation or engagement as an employee of or consultant to any company or entity (including self-employment) which would cause the likely disclosure of H&S proprietary information, Confidential Information or trade secrets.

* * *

As part of [Kaplan's] agreed-upon duties and responsibilities to protect the Heidrick Platform, the Confidential Information and strategic client and candidate relationships developed by H&S, its employees, by virtue of [his] employment with Heidrick, [Kaplan] agree[s] that for six months following the termination of [his] employment, [he] shall not accept any employment, assignment, matter, client representation or engagement as an employee of or consultant to any company or entity (including self-employment) which would cause the likely disclosure of H&S proprietary information, Confidential Information or trade secrets.

130. Kaplan also agreed that he would not solicit current or prospective clients of H&S:

for a period of twelve (12) months after the date [Kaplan's] employment with [H&S] ends for any reason, [Kaplan] shall not . . . solicit, divert or attempt to obtain business from, accept business from, or do business with - or aid or assist others in the same – with any Person for whom [he] provided services or solicited for the provision of services on behalf of [H&S] during the last twelve (12) months of [his] employment for the purpose of engaging in the same Business as [H&S].

131. Kaplan similarly agreed not to solicit any employee of H&S into a position where H&S Confidential Information is relevant:

for the period of [Kaplan's] employment by [H&S] and for twelve (12) months after the date of [his] employment with [H&S] ends for any reason, [Kaplan] agree[s] not to directly or indirectly solicit or hire any employee of [H&S] with whom [he] worked during [his] employment at [H&S], or any individual who possesses Confidential Information about [H&S] into any position, engagement or assignment where such Confidential Information may be relevant.

132. Kaplan further agreed that, upon termination of his employment from H&S, he would: (i) "return and deliver to H&S all of the papers records, film, documents . . . which [he] may have relating, in any way, to the business or clients of H&S, all of which is and shall be the exclusive property of H&S;" and (ii) "immediately delete, destroy, and/or disable any email, 'cloud' or other remote storage accounts which contain any electronic copies of and/or data reflecting any [H&S] Confidential Information . . ."

2. **Kaplan's Resignation and Breaches of the Kaplan Agreement**

a. <u>Breaches of the Non-Competition Provisions of the Kaplan Agreement</u>

133.    Kaplan resigned from H&S on January 23, 2018.

134.    Given that Kaplan failed to complete three years of service with H&S, Kaplan must, but has failed to, reimburse H&S approximately $4,000 of the sign-on bonus he received at the outset of his employment at H&S as required in accordance with the terms of the Kaplan Agreement.

135.    Shortly prior to his resignation, Kaplan breached the non-competition provisions of his employment agreement by accepting a position with Korn Ferry in substantially the same role he held at H&S and, thus, he accepted a position that was and is still likely to cause the disclosure of H&S confidential and proprietary information and trade secrets.

136.    On January 30, 2018 – a mere seven days following Kaplan's resignation from H&S  – Korn Ferry issued a Press Release announcing that Kaplan joined the firm's New York office in the CHRO consulting and recruitment practice, just as he had worked when at H&S.

137.    The press release touted Kaplan's prior experience at H&S, highlighting that he recently "was a managing partner and a head of the Global Chief Human Resources Practice at a major executive search firm," where "his assignments spanned the U.S., Asia, Europe and Latin America."

138.    In performing executive search projects at Korn Ferry in the same business sector that he had been working in prior to his resignation from H&S, Kaplan will inevitably use and/or disclose H&S Confidential Information.

b. <u>Breaches of the Confidentiality and Non-Disclosure Provisions of the Kaplan Agreement</u>

139.    H&S discovered that, prior to Kaplan's resignation, Kaplan breached the confidentiality provisions of his employment agreement by forwarding H&S Confidential

Information related to H&S clients and open client engagements to his personal email account on January 4, 2018.

140.    In particular, on January 4, 2018, shortly before his resignation, Kaplan forwarded an Excel spreadsheet reflecting the names of candidates H&S was pursuing for a position at an H&S client. The spreadsheet reflects confidential information concerning whether H&S believed the candidates were qualified for or interested in the position.  The spreadsheet also reflected the status of the search process with respect to each of the potential candidates, including wither H&S was pursuing the candidate, whether H&S had interviewed the candidate and whether the client was interested in or had decided to "pass" on the candidate.  The spreadsheet also reflected the current employer of the candidates.

141.    Similarly, Kaplan forwarded a PowerPoint presentation pertaining to the search for H&S' client to his personal email address on January 4, 2018.  The PowerPoint reflected the identities of "Active" candidates for an executive search that H&S was engaged to pursue, including a "Notes" section for certain candidates, reflecting non-public information that H&S had compiled concerning, among other things, H&S' impressions of the candidates qualifications and the rationale for the candidate's desire to depart from his or her then current position,

142.    In addition, Kaplan initially failed to return the Lenovo Thinkpad T440s laptop computer that he had used at H&S.  On February 7, 2018, H&S' General Counsel, Kamau Coar, contacted Kaplan to demand the return of that device.

143.    Upon Kaplan's subsequent return of that device, a preliminary forensic review revealed that, on January 24, 2018, one day **after** his resignation from H&S and before he returned the laptop to H&S, Kaplan inserted a USB flash drive into the computer and attempted to open at least one contact file.

144.    Kaplan did not surrender any USB drives to H&S or otherwise leave such drives behind when he resigned.  Thus, Kaplan may have possession, custody and control of client lists and other H&S confidential and proprietary information, which he either has used or will use to H&S' competitive detriment.

145.    In performing executive search projects at Korn Ferry, in the same business sector that he had been working in prior to his resignation from H&S, Kaplan will inevitably use and/or disclose H&S Confidential Information.

c.    H&S Efforts to Persuade Kaplan to Cure His Breaches of the Kaplan Agreement

146.    By letter to Kaplan, dated January 31, 2018 (the "Kaplan January 31 Letter") – the day after H&S learned that he had accepted a position in the CHRO practice at Korn Ferry - H&S informed Kaplan, *inter alia*, that H&S had learned that Kaplan had been forwarding H&S Confidential Information directly related to H&S clients and open client engagements to his personal email account, and that such actions were in violation of his employment agreement and H&S policy.

147.    In the Kaplan January 31 Letter, H&S requested, *inter alia,* that Kaplan: (i) provide a written explanation for his decision to forward H&S Confidential Information outside of H&S' systems; (ii) return all H&S Confidential Information and property of H&S to H&S and delete all such information from any device containing such information; and (iii) provide written confirmation of the same by February 2, 2018.

d.    Breaches of the Non-solicitation Provisions in the Kaplan Agreement

148.    Subsequent to the sending of the Kaplan January 31 Letter, Kaplan has solicited at least two current H&S clients in an effort to sway them to move their business to Korn Ferry in violation of his agreement with H&S.

149.     First, on or around February 1, 2018, H&S learned that Kaplan had contacted an employee he had placed at an H&S client who informed H&S that Kaplan "already contacted [him] to get work."

150.     Second, on or around February 16, 2018, H&S learned that Kaplan had contacted an employee he recently had placed at another H&S client, who informed H&S that Kaplan had contacted him to congratulate him on his new role.

151.     Similarly, prior to his resignation, Kaplan had been working to secure an engagement with a potential new client.  Following Kaplan's resignation, H&S learned that it had not "won" the engagement under circumstances raising a suspicion that Kaplan had attempted to sway the client to decline to proceed with H&S.

152.     In addition, Kaplan has solicited at least four H&S employees to join him at Korn Ferry.

153.     For example, by email dated February 12, 2018, a current H&S employee in H&S' Global Technology & Services Practice, who had worked closely with Kaplan while the two were H&S employees, emailed Marat Fookson of Korn Ferry to "thank [Mr. Fookson] for allowing [him] to be considered at Korn Ferry and for Korn Ferry's "extremely generous" offer of employment.

154.     The next day, the same H&S employee forwarded his communication with Mr. Fookson to Kaplan with the following note thanking him for the opportunity to be considered for a position at Korn Ferry:

> Your friendship means the world to me and I hope I didn't let you down. My family is in debt to you for both of these opportunities and you truly have impacted our lives for the better.

155.     Kaplan also solicited Paul Viola and Michelle Vogt to work at Korn Ferry.  Both Mr. Viola and Ms. Vogt are former H&S Associates and worked with Kaplan in the CHRO

practice at H&S, prior to Kaplan's resignation.

156.     Mr. Viola resigned from H&S on February 23, 2018, to work for Korn Ferry.

157.     Although Ms. Vogt has, to H&S' present knowledge, not joined Korn Ferry, she recently resigned from her position at H&S**.**

158.     Kaplan further solicited Magaly Urban, who served as his executive assistant at H&S.  Ms. Urban is now an employee of Korn Ferry.

## FIRST CAUSE OF ACTION
### (Breach of Contract Against Defendant Astmann)

159.     H&S repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

160.     Pursuant to the Astmann Agreement and the Confidentiality Agreement incorporated by reference and annexed as Exhibit A thereto, for a period of six months after the termination of his employment at H&S, Astmann agreed to prohibitions on, directly or indirectly:  (i) soliciting or hiring any employee of H&S who he worked with while employed at H&S or who possesses Confidential Information about H&S into any position in which such Confidential Information may be relevant; and (ii) soliciting, diverting or attempting to obtain business from any current or prospective client of H&S.

161.     Astmann further agreed to prohibitions on disclosing or using H&S Confidential Information following the term of his employment and to return all H&S property and Confidential Information to H&S.  He likewise is contractually obligated to, among other things: (i) return and deliver to H&S all papers and documents he may have relating, in any way, to the business or clients of H&S; and (ii) delete, destroy, and/or disable any email, 'cloud' or other remote storage accounts which contain any electronic copies of and/or data reflecting any H&S Confidential Information.

162.     Astmann has breached the Astmann Agreement and the Confidentiality Agreement annexed thereto by, among other things: (i) soliciting employees of H&S to join Korn Ferry; (ii) upon information and belief, soliciting, diverting or attempting to obtain business from clients, customers and/or candidates of H&S; and (iii) upon information and belief, disclosing H&S Confidential Information to Korn Ferry and/or using H&S Confidential Information for Korn Ferry's benefit.

163.     As a result of Astmann's breaches of his employment agreement with H&S, H&S has suffered irreparable harm, including, but not limited to, misappropriation of its Confidential Information, loss of employees, clients, business opportunities, and harm to its reputation and goodwill.

164.     As a result of Astmann's breaches, H&S seeks, among other remedies, injunctive relief and damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Breach of Contract Against Defendant Vyas)

165.     H&S repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

166.     Pursuant to the Vyas Agreement and the Confidentiality Agreement incorporated by reference and annexed as Exhibit A thereto, for a period of twelve months after the termination of her employment at H&S, Vyas agreed to prohibitions on, directly or indirectly: (i) soliciting or hiring any employee of H&S who she worked with during her employment with H&S or any individual who possesses Confidential Information about H&S into any position in which such Confidential Information may be relevant; and (ii) soliciting, diverting or attempting to obtain business from any current or prospective client of H&S.

167.     Vyas also agreed that for six months following the termination of her employment

with H&S, she would not accept any employment, assignment, matter, client representation or engagement as an employee of or consultant to any company or entity (including self-employment) which would potentially benefit from and/or cause the likely disclosure of H&S proprietary information, Confidential Information or trade secrets.

168.     Vyas further agreed to prohibitions on disclosing or using H&S Confidential Information following the term of her employment and to return all H&S property and Confidential Information to H&S.  She likewise is contractually obligated to, among other things:  (i) return and deliver to H&S all papers and documents she may have relating, in any way, to the business or clients of H&S; and (ii) delete, destroy, and/or disable any email, 'cloud' or other remote storage accounts which contain any electronic copies of and/or data reflecting any H&S Confidential Information.

169.     Vyas has breached the Vyas Agreement and the Confidentiality Agreement incorporated by reference and annexed as Exhibit A thereto by, among other things:  (i) working as an employee of Korn Ferry within six months after her employment with H&S; (ii) soliciting employees of H&S to leave H&S and accept employment at Korn Ferry; (iii) upon information and belief, soliciting clients, customers, and/or candidates of H&S; (iii) forwarding H&S Confidential information to her personal email account; (iv) failing to certify the deletion of H&S Confidential Information that she had improperly diverted to her personal email account; and (v) disclosing H&S confidential and proprietary information and trade secrets to Korn Ferry and/or using H&S Confidential Information for Korn Ferry's benefit.

170.     As a result of Vyas' breaches of her employment agreement with H&S, H&S has suffered irreparable harm, including, but not limited to, misappropriation of its Confidential Information, loss of employees, clients, business opportunities, and harm to its reputation and

goodwill.

171.    As a result of Vyas' breaches, H&S seeks, among other remedies, injunctive relief and damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
**(Breach of Contract Against Defendant Kaplan)**

172.    H&S repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

173.    Pursuant to the Kaplan Agreement and the Consultant Business Protection Agreement incorporated by reference and annexed as Exhibit A thereto, for a period of twelve months after the termination of his employment at H&S, Kaplan agreed to prohibitions on, directly or indirectly:  (i) soliciting or hiring any employee of H&S who he worked with during his employment with H&S or any individual who possesses Confidential Information about H&S into any position in which such Confidential Information may be relevant; and (ii) soliciting, diverting or attempting to obtain business from any current or prospective client of H&S.

174.    Kaplan also agreed that for six months following the termination of his employment with H&S, he would not accept any employment, assignment, matter, client representation or engagement as an employee of or consultant to any company or entity (including self-employment) which would cause the likely disclosure of H&S proprietary information, Confidential Information or trade secrets.

175.    Kaplan further agreed to prohibitions on disclosing or using H&S Confidential Information following the term of his employment and to return all H&S property and Confidential Information to H&S.  He likewise is contractually obligated to, among other things: (i) return and deliver to H&S all papers, and documents which he may have relating, in any way, to the business or clients of H&S; and (ii) delete, destroy, and/or disable any email, 'cloud' or

other remote storage accounts which contain any electronic copies of and/or data reflecting any H&S Confidential Information.

176.    Since resigning from H&S, Kaplan has breached the Kaplan Agreement and the Consultant Business Protection Agreement annexed as Exhibit A thereto by, among other things: (i) working as an employee of Korn Ferry within six months after his employment with H&S; (ii) upon information and belief, soliciting employees of H&S to join Korn Ferry; (iii) soliciting clients, customers, and/or candidates of H&S; (iv) forwarding H&S confidential and proprietary information and trade secrets to his personal email account; (v) failing to certify the deletion of H&S Confidential Information that he had improperly diverted to his personal email account; (vi) failing to return H&S property including Confidential Information to H&S; (vii) disclosing H&S Confidential Information to Korn Ferry and/or using H&S confidential and proprietary information and trade secrets for Korn Ferry's benefit; and (viii) failing to reimburse H&S a pro-rated portion of his sign-on Bonus, totaling approximately $4,000.

177.    As a result of Kaplan's breaches of his employment agreement with H&S, H&S has suffered irreparable harm, including, but not limited to, misappropriation of its Confidential Information, loss of employees, clients, business opportunities, and harm to its reputation and goodwill.

178.    As a result of Kaplan's breaches, H&S seeks, among other remedies, injunctive relief and damages in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION
**(Trade Secret Misappropriation Under 18 U.S.C. §§ 1836 *et seq.*
against Korn Ferry, Astmann, Vyas and Kaplan)**

179.    H&S repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

180.    As set forth above in detail, H&S developed, is the owner of, and was, at all

relevant times, in possession of the H&S trade secrets and confidential information.

181.    H&S' trade secrets and confidential information, including, in particular, the *Infinity* framework, *Latitude* and *Leadership Signature,* relate to and are used in or intended for use in, interstate or foreign commerce.

182.    H&S' trade secrets and confidential information is not generally known in the marketplace and would be of significant economic value to competitors in the executive search firm industry.    H&S' competitive advantage stems from the fact that its confidential and proprietary information is not generally known. Thus, as set forth above, H&S has taken and continues to take significant precautions to ensure that such information is secured and is not accessible to any individual or entity that can use such information to compete with H&S.

183.    H&S has made and continues to make efforts that are reasonable under the circumstances to secure the secrecy of its trade secrets and confidential information, including, among others, requiring persons who access it, such as Astmann, Vyas and Kaplan, to execute the non-disclosure agreements described above.

184.    Astmann, Vyas and Kaplan have misappropriated, continue to misappropriate, and/or inevitably will misappropriate H&S trade secrets and confidential information by disclosing and using it for Korn Ferry's and their respective benefits to solicit H&S' clients, candidates, and customers throughout the United States, including in New York, while knowing that they each have a duty, both contractually and under common law, to maintain its secrecy or limit its use.

185.    Upon information and belief, Korn Ferry misappropriated and acquired certain H&S confidential information through improper means, including: (i) inducing the Former H&S Employees to obtain and/or disclose H&S' confidential information in violation of the non-

competition, non-solicitation and non-disclosure provisions in their respective employment agreements; and/or (ii) receiving and using certain H&S confidential information for Defendants' benefit, while knowing, or having reason to know that it had been acquired by unlawful or improper means.

186.    In addition, Korn Ferry acquired H&S trade secrets and confidential information from Astmann, Vyas and Kaplan, among others, with knowledge that Astmann, Vyas and Kaplan were under a duty to maintain its secrecy.

187.    Moreover, since at least October 2017, Korn Ferry has proceeded with a predatory scheme aimed at poaching H&S employees from their positions at H&S, recruiting them to work at Korn Ferry with the goal of acquiring and misusing to its own benefit H&S' trade secrets and confidential information.

188.    Korn Ferry has knowingly permitted and taken advantage of Vyas', Kaplan's and Astmann's misuse of H&S trade secrets and confidential information in violation of the non-disclosure provisions in their respective agreements and Korn Ferry has enabled Astmann, Vyas and Kaplan to use such information for its benefit.

189.    Unless injunctive relief is entered, H&S will suffer immediate and irreparable harm in the form of lost business relationships, which took time and money to cultivate, the loss of goodwill and business reputation, the misappropriation and use of the H&S confidential and proprietary information and trade secrets and other recognized injuries.

190.    H&S has no adequate remedy at law for its present and threatened injuries.

191.    As a result of Korn Ferry's, Astmann's, Vyas' and Kaplan's wrongful conduct, H&S seeks:  (i) injunctive relief; (iii) compensatory and statutory damages in an amount to be determined at trial; (iii) exemplary damages as set forth in 18 U.S.C. § 1836 (b)(3)(c); and (iv)

all reasonable attorneys' fees and costs.

## FIFTH CAUSE OF ACTION
### (Misappropriation of Confidential and Proprietary
### Information and Trade Secrets Against All Defendants)

192.    H&S repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

193.    H&S spent significant time and effort and expended substantial resources to create and maintain the secrecy of H&S trade secrets and confidential information.    This information was developed through years of painstaking research, development, expense, and cultivation of customer, client, and candidate relationships that give H&S a competitive edge.

194.    H&S took significant precautionary measures to secure and preserve the H&S trade secrets and confidential information, by, among other things, restricting access to it and disclosing it to only those persons who need and require it to perform their duties for H&S and requiring persons who access them, such as the Former H&S Employees, to execute non-disclosure agreements such as those at issue.

195.    By virtue of their positions within H&S, the Former H&S Employees had access to the H&S Confidential Information.

196.    During and after their employment with H&S, the Former H&S Employees, both individually and, on behalf of Korn Ferry, acted in bad faith and misappropriated a commercial advantage belonging to H&S by using and exploiting H&S trade secrets and confidential information.

197.    Defendants intentionally misappropriated H&S trade secrets and confidential information and are or may use it to continue to solicit H&S' clients, customers and/or candidates from H&S to Korn Ferry at H&S' expense.

198.    Unless injunctive relief is entered, H&S will suffer irreparable harm, including,

but not limited to, misappropriation of its trade secrets and confidential information, loss of employees, clients, business opportunities, and harm to its reputation and goodwill.

199.    H&S has no adequate remedy at law for its present and threatened injuries.

200.    As a result of Defendants' wrongful conduct, H&S seeks, among other remedies, injunctive relief and damages against Korn Ferry, Astmann, Vyas and Kaplan in an amount to be determined at trial.

**SIXTH CAUSE OF ACTION**
**(Tortious Interference with Contractual Relations Against Korn Ferry and Astmann)**

201.    H&S repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

202.    Upon information and belief, Korn Ferry possessed knowledge and information concerning the post-employment restrictions set forth in the Astmann Agreement, Vyas Agreement and Kaplan Agreement when it hired Astmann, Vyas and Kaplan.

203.    Astmann possessed knowledge and information concerning the post-employment restrictions set forth in the Vyas Agreement when Astmann:  (i) solicited Vyas to resign from H&S; (ii) encouraged Vyas to accept a position with Korn Ferry; and (iii) Korn Ferry hired Vyas.

204.    Korn Ferry intentionally and improperly prevented the Former H&S Employees, among others, from rendering full performance of their obligations under their respective employment agreements by aiding and encouraging Astmann, Vyas and Kaplan, among others, to breach those agreements as further set forth above.

205.    Korn Ferry's recruitment of H&S employees proceeded notwithstanding and in spite of the fact that Korn Ferry is aware that it is common industry practice for executive recruiters to be bound be restrictive covenants in their employment agreements, including the

non-competition, non-solicitation and confidentiality agreements at issue here. Indeed, upon information and belief, Korn Ferry routinely includes restrictive covenants in its employment agreements, including provisions largely identical to the non-competition, non-solicitation and confidentiality agreements at issue here.

206. In the absence of Korn Ferry's misconduct as described above, including their offers of above-market compensation, the Former H&S Employees, among others, would not have resigned from H&S and taken similar positions at Korn Ferry, and would not have breached their employment agreements with H&S.

207. Similarly, Astmann intentionally and improperly prevented Vyas from rendering full performance of the Vyas Agreement by aiding and encouraging Vyas to breach that agreement as further set forth above.

208. This wrongful conduct was undertaken with the sole intent of interfering with the Astmann Agreement, Vyas Agreement and Kaplan Agreement, among others, or rendering performance under those agreements impossible.

209. Korn Ferry's conduct is intentional, willful, wanton and/or reckless and is calculated to harm H&S.

210. Unless injunctive relief is entered, H&S will suffer irreparable harm, including loss of employees, clients, business opportunities, and harm to its reputation and goodwill.

211. H&S has no adequate remedy at law for its present and threatened injuries.

212. As a result of Korn Ferry and Astmann's wrongful conduct, H&S seeks, among other remedies, injunctive relief, and compensatory and punitive damages in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION
### (Unfair Competition against Korn Ferry)

213.    H&S repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

214.    Korn Ferry has intentionally targeted and pursued H&S employees with the intention of hiring them for the purposes of harming H&S by, among other things, misappropriating and/or benefitting from the disclosure and/or use by those employees of H&S' confidential, proprietary and competitively sensitive information and trade secrets, which was acquired by those employees during their employment at H&S.

215.    Since at least the middle of 2017, Korn Ferry has acted in bad faith by systematically and intentionally targeting H&S employees working in particular groups and industries for the specific purpose of harming H&S, and particularly those H&S groups and industries, by depriving them of the services of the targeted employees and with the intention of misappropriating and/or benefitting from:  (i) the client relationships and coworker relationships developed by those employees during their employment at H&S; and (ii) the disclosure and/or use by those employees of confidential, proprietary and competitively sensitive information and trade secrets acquired by those employees during their employment at H&S.

216.    As a direct result of this improper campaign against H&S, Korn Ferry has recruited and continues to recruit H&S employees, with full knowledge and awareness that those employees have agreements with H&S that include non-competition, non-solicitation and confidentiality agreements that may be breached by those employees accepting the employment offered by Korn Ferry immediately after they leave H&S.

217.    Upon information and belief, Korn Ferry has acted in bad faith by offering H&S employees positions at Korn Ferry on terms and with conditions that are specifically intended to

induce and entice those employees to breach their ongoing obligations to H&S.

218. As a direct result of this improper campaign against H&S, Korn Ferry has harmed and continues to harm H&S' valuable ongoing relationships with the targeted employees, with H&S' other employees and with its clients.

219. As a result of Korn Ferry's wrongful conduct, H&S seeks, among other remedies, injunctive relief, and compensatory and punitive damages in an amount to be determined at trial.

## <u>EIGHTH CAUSE OF ACTION</u>
### (Breach of Duty of Loyalty Against Astmann, Vyas and Kaplan)

220. H&S repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

221. As employees of H&S, Astmann, Vyas and Kaplan each owed common law duties of loyalty to H&S and were required to act in utmost good faith in the furtherance and advancement of H&S' interests, including maintaining the confidentiality of the H&S confidential and proprietary information and trade secrets, which H&S entrusted to Astmann, Vyas and Kaplan.

222. These obligations continued after Astmann, Vyas and Kaplan terminated their employment with H&S.

223. Astmann, Vyas, Kaplan and each failed to act in the best interest of H&S and materially breached their duty of loyalty to H&S, including by:

      a. Recruiting H&S employees to leave their positions at H&S and join Korn Ferry, including, but not limited to, Vyas, Michelle Vogt, Paul Viola, and Abrue Hussain;

      b. Contacting H&S' customers and enticing them to move their business from H&S to Korn Ferry;

c.   Misappropriating and wrongfully retaining H&S confidential and proprietary information and trade secrets, including by forwarding confidential information pertaining to clients and candidates to personal email addresses; and/or

d.   Disclosing and/or using H&S' confidential and proprietary information and trade secrets;

e.   Accepting employment with a direct competitor of H&S; and/or

f.   Otherwise acting against the interests of H&S, including, upon information and belief, making preparations to use and misuse H&S confidential and proprietary information and trade secrets while still employed by H&S.

224.   Astmann, Vyas and Kaplan have materially breached or intend to breach their common law duty of loyalty to H&S by using H&S confidential and proprietary information and trade secrets for their own benefit and for the benefit of their new employer, Korn Ferry, by soliciting H&S employees to leave H&S and join Korn Ferry and/or by referring H&S clients to Korn Ferry for executive search services.

225.   H&S has suffered and will continue to suffer irreparable injury in addition to monetary damages as a direct and proximate result of Astmann's, Vyas' and Kaplan's breaches of their duty of loyalty to H&S.

226.   Unless restrained by this Court, Astmann, Vyas and Kaplan will continue their unlawful actions and H&S will continue to be irreparably harmed.

227.   H&S has no adequate remedy at law for its present and threatened injuries.

228.   As a result of Astmann's, Vyas' and Kaplan's wrongful conduct, H&S seeks

injunctive relief and compensatory damages against Astmann, Vyas and Kaplan in an amount to be determined at trial.

## NINTH CAUSE OF ACTION
### (Aiding and Abetting Breach of Duty of Loyalty Against Korn Ferry and Astmann)

229.    H&S repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

230.    Astmann was aware of, aided and abetted, and substantially assisted the breaches of the duty of loyalty by Vyas described above.

231.    Korn Ferry solicited Astmann, Vyas and Kaplan to leave H&S and join Korn Ferry notwithstanding Korn Ferry's knowledge that it is common for executive recruiters, such as Astmann, Vyas and Kaplan, to be restricted in their ability to use their prior employer's confidential and proprietary information, including information pertaining to clients and candidates, for their new employer's benefit.

232.    Korn Ferry substantially assisted the Former H&S Employees' breaches of the duty of loyalty by enticing them to leave H&S and join Korn Ferry with offers of above-market compensation.

233.    As a direct and proximate result of Astmann's and Korn Ferry's misconduct, H&S has suffered substantial monetary damages.

234.    As a result of Korn Ferry and Astmann's wrongful conduct, H&S seeks, among other remedies, injunctive relief and damages in an amount to be determined at trial.

## TENTH CAUSE OF ACTION
### (Permanent Injunction Against Korn Ferry, Astmann, Vyas and Kaplan)

235.    H&S repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

236.    As set forth above, Astmann, Vyas, and Kaplan have violated, are actively

violating or are planning to violate their respective employment agreements.

237.    Upon information and belief, Korn Ferry hired Astmann, Vyas and Kaplan despite being apprised of their employment agreements, including the non-compete, non-solicitation and non-disclosure obligations contained therein.

238.    Upon information and belief, Korn Ferry, Astmann, Vyas and Kaplan have engaged or will engage in an organized and systematic effort to solicit H&S' clients, customers, and candidates, and to actively exploit client, customer, and candidate relationships Astmann, Vyas, and Kaplan developed while working at H&S.

239.    Korn Ferry, Astmann, Vyas and Kaplan have engaged or will engage in an organized and systematic effort to solicit H&S' employees who possess H&S confidential and proprietary information and trade secrets to resign from H&S and work for Korn Ferry in a manner in which such information is material and relevant.

240.    Astmann, Vyas and Kaplan have disclosed or will inevitably disclose and Defendants have used or will inevitably use the H&S confidential and proprietary information and trade secrets to compete with H&S in the marketplace.

241.    Unless injunctive relief is entered, H&S will suffer irreparable harm including, but not limited to, misappropriation of its confidential and proprietary information and trade secrets, loss of employees, clients, business opportunities, and harm to its reputation and goodwill.

242.    H&S has no adequate remedy at law for its present and threatened injuries.

243.    Accordingly, H&S is entitled to permanent injunctive relief enjoining and restraining Korn Ferry from: (i) employing Vyas before July 16, 2018; (ii) employing Kaplan before July 23, 2018; and (iii) using and/or disclosing any H&S Confidential Information.

244. H&S is entitled to permanent injunctive relief enjoining and restraining Astmann from directly or indirectly using and/or disclosing any H&S confidential and proprietary information and trade secrets to any third-party, including Korn Ferry.

245. H&S is entitled to permanent injunctive relief enjoining and restraining Vyas from: (i) accepting or continuing to remain employed by Korn Ferry or any other company or entity which would potentially benefit from and/or cause the likely disclosure of H&S confidential and proprietary information and trade secrets prior to July 16, 2018; (ii) directly or indirectly using and/or disclosing any H&S confidential and proprietary information and trade secrets to any third-party, including Korn Ferry; and (iii) directly or indirectly soliciting H&S' clients, customers, candidates or employees for a business that competes with H&S before January 16, 2019.

246. H&S is entitled to permanent injunctive relief enjoining and restraining Kaplan from: (i) accepting or continuing to remain employed by Korn Ferry or any other company or entity which would potentially benefit from and/or cause the likely disclosure of H&S confidential and proprietary information and trade secrets prior to July 23, 2018; (ii) directly or indirectly using and/or disclosing any H&S confidential and proprietary information and trade secrets to any third-party, including Korn Ferry; and (iii) directly or indirectly soliciting H&S' clients, customers, candidates or employees for a business that competes with H&S before January 23, 2019.

247. H&S is also entitled to an Order directing Astmann, Vyas and Kaplan to return to H&S all H&S property and copies of any documents within their possession, custody or control which contain H&S confidential and proprietary information and trade secrets.

## PRAYER FOR RELIEF

WHEREFORE, H&S demands the following relief:

1. On the First Cause of Action for Astmann's breaches of the Astmann Agreement, judgment in H&S' favor in an amount to be determined at trial, and interest, costs and attorney's fees;

2. On the Second Cause of Action for Vyas' breaches of the Vyas Agreement, judgment in H&S' favor in an amount to be determined at trial, and interest, costs and attorney's fees;

3. On the Third Cause of Action for Kaplan's breaches of the Kaplan Agreement, judgment in H&S' favor in an amount to be determined at trial, and interest, costs and attorney's fees;

4. On the Fourth Cause of Action for violation of 18 U.S.C. §§ 1836, *et seq.*, judgment in H&S' favor, compensatory and exemplary damages in an amount to be determined at trial and interest, costs and attorney's fees;

5. On the Fifth Cause of Action for misappropriation of confidential information and trade secrets, judgment in H&S' favor, damages in an amount to be determined at trial, injunctive relief and interest, costs and attorney's fees;

6. On the Sixth Cause of Action for tortious interference with contract, judgment in H&S' favor, injunctive relief, compensatory and punitive damages in amount to be determined at trial and interest, costs and attorney's fees;

7. On the Seventh Cause of Action for unfair competition, judgment in H&S' favor, injunctive relief, compensatory and punitive damages in an amount to be determined at trial, and interest, costs and attorney's fees;

8. On the Eighth Cause of Action for breach of the duty of loyalty, judgment in H&S' favor, injunctive relief, damages in an amount to be determined at trial and interest, costs and attorney's fees;

9. On the Ninth Cause of Action for aiding and abetting breach of the duty of loyalty, judgment in H&S' favor, injunctive relief, damages in an amount to be determined at trial and interest, costs and attorney's fees;

10. On the Tenth Cause of Action:

    a. an order temporarily, preliminarily and permanently enjoining and restraining Defendant Astmann and his employers, agents, affiliates, and all those acting in concert with him or on his behalf or by his direction from directly or indirectly using and/or disclosing H&S confidential and proprietary information and trade secrets;

    b. an order temporarily, preliminarily and permanently enjoining and restraining Defendant Vyas and her employers, agents, affiliates, and all those acting in concert with her or on her behalf or by her direction from directly or indirectly from: (i) accepting any employment within the United States which would potentially benefit from and/or cause the likely disclosure of H&S' proprietary information, confidential information or trade secrets for a period of six months following her resignation from

H&S; (ii) soliciting H&S clients or employees for a period of twelve months following her resignation from H&S; and (iii) using and/or disclosing H&S confidential and proprietary information and trade secrets;

c. An order temporarily, preliminarily and permanently enjoining and restraining Defendant Kaplan and his employers, agents, affiliates, and all those acting in concert with him or on him behalf or by his direction from directly or indirectly from: (i) accepting any employment within the United States which would potentially benefit from and/or cause the likely disclosure of H&S' proprietary information, confidential information or trade secrets for a period of six months following his resignation from H&S; (ii) soliciting H&S clients or employees for a period of twelve months following his resignation from H&S; and (iii) using and/or disclosing H&S confidential and proprietary information and trade secrets; and

d. an order temporarily, preliminarily and permanently enjoining Korn Ferry from: (i) employing Vyas before July 16, 2018; (ii) employing Kaplan before July 23, 2018; (iii) using and/or disclosing any H&S confidential information; (iv) aiding and abetting breaches of the duty of loyalty by Astmann, Vyas and Kaplan; (v) tortuously interfering with H&S' employment agreements with Astmann, Vyas and Kaplan, among others, and (vi) engaging in unfair competition as set forth above; and

11. Such other and further relief as the Court deems just, proper, and equitable.

Dated: May 23, 2018

Respectfully submitted,

REED SMITH LLP


/s/ Colin A. Underwood
   Colin A. Underwood
   Joseph Teig
REED SMITH LLP
599 Lexington Avenue
New York, NY 10022-7650
Telephone: (212) 521 5400
Facsimile: (212) 521 5450

Peter M. Ellis (admitted *pro hac vice*)
REED SMITH LLP
10 South Wacker Drive, 40th Floor
Chicago, Illinois 60606
Telephone: (312) 207-1000
Facsimile: (312) 207-6400

Melissa Rubenstein
REED SMITH LLP
136 Main Street, Suite 250
Princeton Forrestal Village
Princeton, NJ 08540
Telephone: (609) 987-0050
Facsimile: (609) 951-0842

Counsel for Plaintiff
*Heidrick & Struggles International, Inc.*